FILED
03/26/2021
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 4, 2020 Session

## STATE OF TENNESSEE v. JADARIUS SANKEVIOUS FOSTER

**Appeal from the Circuit Court for Madison County**
**No. 19-788    Roy B. Morgan, Jr., Judge**

_____

### No. W2020-00349-CCA-R3-CD

_____

The Defendant, Ladarius Sankevious Foster, was convicted by a Madison County Circuit Court jury of failure to maintain lane, possession of drug paraphernalia, and theft of property, and the trial court imposed an effective sentence of eleven months and twenty-nine days, with the Defendant to serve ten days in jail and the remainder of his sentence on community corrections. See Tenn. Code Ann. §§ 55-8-123, 39-17-425(a), 39-14-103. On appeal, the Defendant argues: (1) the evidence is insufficient to sustain his convictions for possession of drug paraphernalia and theft of property, and (2) the trial court failed to conduct an independent assessment of the fines fixed by the jury in this case. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

Jessica F. Butler, Assistant Public Defender, Tennessee District Public Defenders Conference, Franklin, Tennessee (on appeal); George Morton Googe, District Public Defender; and Jeremy B. Epperson, Assistant Public Defender, Jackson, Tennessee (at trial), for the Defendant-Appellant, Jadarius Sankevious Foster.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Michelle Shirley, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

In September 2019, the Madison County Grand Jury indicted the Defendant for failure to maintain lane in Count 1, possession of drug paraphernalia in Count 2, theft of property in Count 3, and unlawful possession of a firearm in Count 4. Two days prior to

trial, the trial court, upon motion by the State, entered an order of nolle prosequi on Count 4.[1]

**Trial.** At the February 6, 2020 trial, John Whitney Hughes Tomlinson testified that he was the owner of J & H Gun Store, also known as Crossroads Outdoor, in Corinth, Mississippi. On August 30, 2018, Tomlinson's store was burglarized, and ten guns were stolen, including a nine millimeter Glock 19 semi-automatic pistol that he received in his store on August 21, 2018. Video surveillance of the burglary showed "two individuals coming in with gloves, jumpsuit[,] and face mask on." Tomlinson said that after discovering the burglary, he completed a federal firearms theft/loss report, admitted as an exhibit, that described and listed the serial number for each of the guns that had been stolen, and he submitted this form to his local police department as well as the local Alcohol, Tobacco, and Firearms office. Tomlinson acknowledged that it would have been possible for one of the burglars to sell one of the stolen guns to someone else, who would not necessarily know the gun was stolen.

Tomlinson identified a receipt showing that a customer had traded the Glock 19 pistol, which meant that Tomlinson, as the owner of the store, became the legal owner of that pistol. Tomlinson said he gave the customer $465 for it but would have "re-stickered" the Glock 19 for "around [$]550." He confirmed that he had been compensated for the loss of this pistol by his insurance company. Tomlinson asserted that he never gave anyone consent to take, keep, possess, or exercise control over the Glock 19 handgun.

Deputy Zach Fitzgerald of the Madison County Sheriff's Office testified that he and Deputy Jason Wooley were patrolling Highway 18, a two-lane road also known as Bolivar Highway, the night of February 23, 2019. Deputy Fitzgerald said that his patrol cruiser was not equipped with a dashboard camera and that he was not wearing a body camera at the time he stopped the Defendant. He explained that while deputies in his office were allowed to purchase their own body cameras, he was not issued a body camera or required to wear one by the sheriff's office. He stated that he and Deputy Wooley were riding in the same cruiser the night they encountered the Defendant.

Deputy Fitzgerald said that he stopped the Defendant, who was driving a burgundy Nissan Maxima, just after 11:00 p.m. He stated that as he was travelling behind the Maxima, the Defendant "crossed over the fog line on the road which is commonly associated with the white line close to the side of the road" and then "he drifted over the white line, he came back and then went over the center line of Highway 18 and then got back in his lane[.]" Deputy Fitzgerald clarified that the location where the Defendant

---

[1] Notably, the defense did not file a motion to suppress the evidence challenging the legality of the traffic stop or the search in this case.

"swerved" was a "straightway" area of the road and that no other traffic was affected by the Defendant's driving. He said that it was "no more than a minute" between the Defendant's infraction and the traffic stop.

Deputy Fitzgerald said that he initiated the traffic stop by activating his blue lights and radioing his location, and the Defendant came to a stop. At the time, Deputy Fitzgerald could tell that the Defendant had a passenger with him in the vehicle. Upon stopping his patrol cruiser, Deputy Fitzgerald approached the driver's side of the Defendant's car, identified himself, and told the Defendant why he stopped him. He requested the Defendant's identification and asked him if there was a reason he had just swerved, and the Defendant said that "his vehicle was out of line[.]" As he was talking to the Defendant, Deputy Fitzgerald "scanned the back seat [of the Defendant's vehicle] with [his] flashlight and noticed that there was a digital scale behind the passenger's seat in the floorboard[.]" Before returning to his cruiser, Deputy Fitzgerald asked the Defendant if he could ask him some additional questions after receiving the Defendant's identification and the female passenger's identification, and the Defendant agreed. Deputy Fitzgerald said that because "officer safety is key," he asked the Defendant, "Are there any firearms in the car?" and then told him, "You're allowed to have them unless you're a convicted felon. We just like to know about it for our safety and yours[.]" The Defendant replied that there were no guns in his car. Deputy Fitzgerald then asked the Defendant if there were any narcotics in the vehicle because he had "already seen the digital scale behind the passenger's seat." The Defendant responded that there were no narcotics in his car. Next, Deputy Fitzgerald asked the Defendant if he was on "probation or parole for anything[,]" and the Defendant said "he was not." At that point, Deputy Fitzgerald returned to his cruiser and "ran a driver's license check" on the Defendant, "check[ing] him for warrants out of Madison [County] and where he's from, Hardeman County," and then checking the Defendant's passenger "to make sure she was clear of warrants[.]" He stated that the Defendant and his passenger had no outstanding warrants.

Deputy Fitzgerald returned to the Defendant's car, informed the Defendant that he was "going to give him a warning citation for . . . driving outside the lines," and asked the Defendant to exit the vehicle. He said that after he told the Defendant that he was just going to give him a warning citation, the Defendant did not calm down and "stayed very nervous." As the Defendant exited his vehicle, Deputy Fitzgerald told him, "Hey, I'm just going to pat you down for weapons" for the purpose of officer safety. Deputy Fitzgerald said he "patted [the Defendant] down[,] and he was clear" and then he "asked [the Defendant] if [he] could search his car."

Deputy Fitzgerald said that when he asked if he could search the Defendant's vehicle, the Defendant refused to give consent. He told the Defendant, "Hey, man, I already see the digital scale," and then asked him, "Is there anything illegal in your car?"

and the Defendant admitted, "There's enough marijuana for a blunt in the ashtray[.]" Deputy Fitzgerald said that the Defendant's admission regarding the marijuana gave him probable cause to search the Defendant's vehicle, even though the Defendant had denied consent for him to search. Deputy Fitzgerald told the Defendant, "Look, I'm not worried about a little bit of weed," and asked him, "Is there anything else inside the vehicle?" He said the Defendant was "still very nervous" and "looked down" and "was fidgeting with his hands" before the Defendant stated, "[N]o." Deputy Fitzgerald said that because the Defendant was still acting nervous, he asked, "Is there a gun in this car?" and the Defendant finally admitted that he had a gun in his vehicle. He said that during this entire conversation, the Defendant's voice "was shaky."

Deputy Fitzgerald said that at that point, he asked the passenger to exit the car to ensure officer safety, and then he searched the Defendant's vehicle. During this search, he found "marijuana . . . , just enough for a blunt[,]" as the Defendant had said. In addition, Deputy Fitzgerald observed the butt of a magazine "in between the driver's seat and the center console[,]" and noted that it had been "shoved down pretty far[.]" He retrieved it and determined that it was a "Glock 19 Generation 5 with a 31-round mag[azine]." He said this pistol had "one round chambered" and "had two extra rounds" in the magazine."

Deputy Fitzgerald identified the digital scale that he found on the rear floorboard of the Defendant's vehicle, which was admitted as an exhibit. When he was asked, based on his education, training and experience, about what made this digital scale drug paraphernalia rather than just a kitchen gadget, Deputy Fitzgerald replied:

> These are used to—commonly associated with weighing narcotics. In the State of Tennessee, based on your amount of weight with the drug depends on if it's a misdemeanor or a felony. With marijuana, anything over 14.5 grams is a felony. So it's commonly associated that you would weight your narcotics. Also, the weight depends on how much it costs. So that's [what] makes [the digital scale] drug paraphernalia.

He also asserted that drugs are commonly weighed and then packaged accordingly.

Deputy Fitzgerald reiterated that in addition to the digital scale, he also recovered marijuana from the Defendant's ashtray and the Glock handgun from inside the Defendant's car. Deputy Fitzgerald next identified "a picture that [he] took of the handgun, the marijuana[,] and the magazine," and this photograph, which depicted a substance wrapped in plastic as well as a Glock pistol and magazine lying on a car seat, was admitted at trial. Deputy Fitzgerald said he rendered the pistol safe by locking back the slide for the purpose of "officer safety" and then moved it to the passenger seat with the marijuana before taking the photograph. He explained that the "digital scale [was] not in this picture"

- 4 -

because "[i]t was still behind the passenger's seat" but that "everything else" he found was depicted in the photograph he took. When asked about what happened to the marijuana depicted in the photograph, Deputy Fitzgerald stated:

> I did not charge [the Defendant] with the marijuana. I told him on the scene, I said, "Look, I'm not going to add insult to injury." And if I've said this once, I've said it a thousand times. I said, "God has given me a lot of grace in my life, so I'm going to give you some tonight," and [the Defendant] was allowed to dispose of the marijuana in the grass on the side of the road.

He said that while substances appearing to be marijuana are commonly sent to the state lab to be tested, he never sent the substance he recovered from the Defendant's vehicle to a lab because he allowed the Defendant to dispose of it.

Deputy Fitzgerald identified the Glock 19 that he recovered from the Defendant's vehicle, and this pistol was admitted into evidence. He said that after he rendered the pistol safe, he asked the Defendant about it because he was "trying to figure out why [the pistol] was shoved so far down into the seat and why [the Defendant] was nervous[.]" He asked the Defendant, "Hey, is this gun stolen?" and the Defendant replied, "It's not hot. It's not hot." Nevertheless, when Deputy Fitzgerald ran the pistol's serial number through the crime information database, he found that the pistol had been reported as stolen. He stated that as result of these events, he took the Defendant into custody that night.

Deputy Jason Wooley, a reserve deputy for the Madison County Sheriff's Office, testified that on the night of February 23, 2019, he was on patrol with Deputy Fitzgerald on Highway 18 in south Jackson. They noticed "a dark colored Nissan Maxima" pass by with the Defendant "kind of leaned back or pushed back in the seat in a way to kind of hide his face from us by the center post," which was "what made us draw our attention to him. Deputy Wooley confirmed that the Defendant "was not maintaining his lane" and "was drifting over the fog line and across the center line," which made Deputy Fitzgerald initiate a traffic stop. As Deputy Fitzgerald approached the driver's side of the vehicle, Deputy Wooley approached the vehicle from the passenger side, which enabled him to closely observe the Defendant and the female passenger as Deputy Fitzgerald talked to the occupants of the vehicle and obtained their driver's licenses. Deputy Wooley said that he was actually standing behind the center post of the Defendant's car, where he could look through the rear passenger window to see what the Defendant and the passenger were doing. When Deputy Fitzgerald returned to his cruiser to check if the Defendant and his passenger had any outstanding warrants, Deputy Wooley saw the Defendant "checking his rearview mirror to make sure [Deputy Fitzgerald] wasn't coming back, and [the Defendant] took his right hand and started trying to push something between the driver's seat and center console of the car." Deputy Wooley added, "I couldn't see what it was, but [the

Defendant] was . . . making sure whatever it was was down below the seat where nobody could see it." He said that when Deputy Fitzgerald asked the Defendant and the passenger to exit the vehicle, he got the passenger out and took her to the back of the Defendant's vehicle. As he remained with the passenger, the Defendant was put in handcuffs and placed in the back of the patrol cruiser while Deputy Fitzgerald searched the Defendant's vehicle.

The Defendant did not testify at trial and did not call any witnesses to testify on his behalf.

At the conclusion of trial, the jury convicted the Defendant as charged in Counts 1, 2, and 3. The jury did not fix any fine in Count 1 but fixed $150.00 fine for the possession of drug paraphernalia conviction in Count 2 and a $500.00 fine for the theft of property conviction in Count 3.

**Sentencing.** At the beginning of the sentencing hearing, the trial court recognized that these convictions were "all misdemeanor charges," that the Defendant had "no prior criminal history," and that "there were really no aggravating circumstances at the time of the stop and the arrest." The court also noted that "[t]he jury ha[d] answered the question on fines, as the Defendant had the right to have them do." The court said it was going to consider full suspension of the Defendant's sentence with proper supervision, but it wanted the Defendant to have a drug screen that day.

When the trial court asked the Defendant, who was twenty years old, if he had a job, the Defendant stated that he had "a interview Monday in Murfreesboro, Tennessee," and the court replied, "Of course, I wish you luck with [the interview], but that's not a job." The Defendant explained that he was interviewing in Murfreesboro because he had a girlfriend who lived there, and defense counsel informed the court that the Defendant was currently living with his mother in Bolivar, Tennessee. In response to questioning from the trial court, the Defendant stated that he had been previously employed at two different jobs for approximately three weeks each. The trial court asked if the Defendant would have a place to live if he were offered the job in Murfreesboro, and the Defendant replied that he did have a place to live, although he currently lived at home with his mother in Bolivar.

During the hearing, Deputy Fitzgerald stated that the Glock pistol at issue in this case had been "used in a shooting the night before [the Defendant's arrest]" and that the "[b]allistics did match." The State offered that the Defendant "was scheduled to go to the Hardeman County grand jury" and that although she was unsure "about the status of that indictment, . . . the pending charges were two counts of attempted murder."

- 6 -

During a recess in the sentencing hearing, the Defendant tested negative for drugs. The trial court stated that "[t]he fines [fixed by the jury] will stand." The court then noted:

[The Defendant] asked for a jury trial, and that included fine assessment, so we do have the fines of $500 on the theft and $150 on the paraphernalia, plus his jury costs and court costs. So, he going to owe a lot of money. He must set up payments. He doesn't have a job.

The court informed the Defendant that "the minimum is $100 per month, within 30 days of today" but cautioned, "You'll never get everything paid off in 11 months and 29 days if you don't pay more than $100 a month, but that's the minimum payment." The Defendant acknowledged that he understood about the fines and costs. The trial court ordered the Glock pistol "forfeited to the law enforcement agency that took it at the time of his arrest[,]" and noted that this pistol was "evidence in another crime at this point that has allegedly occurred, the night before [the Defendant was arrested in this case.]"

At the conclusion of the hearing, the trial court imposed concurrent sentences of thirty days for the failure to maintain lane conviction in Count 1 and eleven months and twenty-nine days for each of the convictions for possession of drug paraphernalia and theft of property in Counts 2 and 3. Although the trial court ordered the sentences in Count 1 and Count 3 served on community corrections, the court in Count 2 ordered the Defendant to serve ten days of "shock incarceration day for day" in jail with the remainder of the sentence served on community corrections. When the Defendant stated that he had already served "over 10 days" in jail, the trial court noted, "He might have his credit," and then assured the Defendant, "They'll give you your credit when you get down there." Thereafter, the Defendant filed a timely notice of appeal.

## ANALYSIS

**I.** **Sufficiency of the Evidence.** The Defendant argues that the evidence is insufficient to sustain his convictions for possession of drug paraphernalia and theft of property. The State responds that the proof is sufficient to support both convictions. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When reviewing the sufficiency of the evidence, this court must "determine the elements that the State must prove to establish the offense" and then "analyze all of the evidence admitted at trial in order to determine whether each of the elements is supported by

adequate proof."  State v. Stephens, 521 S.W.3d 718, 723-24 (Tenn. 2017).

"Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e).  When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.  State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).  The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)); see State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) ("Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact.").  Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.  Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)).  When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury."  Wagner, 382 S.W.3d at 297 (citing Bland, 958 S.W.2d at 659).

**A.  Possession of Drug Paraphernalia.**  First, the Defendant argues that the evidence is insufficient to sustain his conviction for possession of drug paraphernalia.  He claims that his possession of a digital scale, without proof that it was used in connection with illegal drugs, is not proof of possession of drug paraphernalia.

Tennessee Code Annotated section 39-17-425, which defines the offense of possession of drug paraphernalia, provides in pertinent part:

[I]t is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture,

compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance or controlled substance analogue in violation of this part.

Tenn. Code Ann. § 39-17-425(a)(1).

In addition, drug paraphernalia is defined as follows:

"Drug paraphernalia" means all equipment, products and materials of any kind which are used, intended for use, or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body, a controlled substance as defined in subdivision (4). "Drug paraphernalia" includes, but is not limited to:

(A) Isomerization devices used, intended for use, or designed for use in increasing the potency of any species of plant that is a controlled substance;

(B) Testing equipment used, intended for use, or designed for use in identifying, or in analyzing the strength, effectiveness or purity of controlled substances; and

(C) Objects used, intended for use, or designed for use in ingesting, inhaling, or otherwise introducing marijuana, marijuana concentrates, marijuana oil, cocaine, hashish, or hashish oil into the human body, such as:

(i) Metal, acrylic, glass, stone, or plastic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls;

(ii) Water pipes;

(iii) Carburetion tubes and devices;

(iv) Smoking and carburetion masks;

(v) Chamber pipes;

(vi) Carburetor pipes;

(vii) Electric pipes;

(viii) Chillums;

(ix) Bongs; and

(x) Ice pipes or chillers[.]

Id. § 39-17-402(12).

As to the determination of whether an object is drug paraphernalia, Code section 39-17-424 provides:

In determining whether a particular object is drug paraphernalia as defined by § 39-17-402, the court or other authority making that determination shall, in addition to all other logically relevant factors, consider the following:

(1) Statements by the owner or anyone in control of the object concerning its use;

(2) Prior convictions, if any, of the owner or of anyone in control of the object for violation of any state or federal law relating to controlled substances;

(3) The existence of any residue of controlled substances on the object;

(4) Instructions, oral or written, provided with the object concerning its use;

(5) Descriptive materials accompanying the object which explain or depict its use;

(6) The manner in which the object is displayed for sale;

(7) The existence and scope of legitimate uses for the object in the community; and

8) Expert testimony concerning its use.

Id. § 39-17-424.

In order to establish a violation of Code section 39-17-425(a)(1), which defines the offense of possession of drug paraphernalia, the State must prove the following three elements beyond a reasonable doubt: "(1) that the defendant possessed an object; (2) that the object possessed was classifiable as drug paraphernalia; and (3) that the defendant intended to use that object for at least one of the illicit purposes enumerated in the statute." State v. Ross, 49 S.W.3d 833, 846 (Tenn. 2001) (citing State v. Mallard, 40 S.W.3d 473, 486 (Tenn. 2001)).

Here, the "object" is the digital scale found in the rear floorboard of the Defendant's vehicle. The Defendant concedes that the first element of this offense is met because the digital scale was within his constructive possession. See State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981). However, he argues there was no proof of the second element, that the digital scale was classifiable as drug paraphernalia, or the third element, that he intended to use the digital scale for at least one of the illicit purposes enumerated in the statute. See Ross, 49 S.W.3d at 846.

The Defendant asserts that nothing in the definition of drug paraphernalia in Code section 39-17-402(12) has anything to do with "scales, digital scales, weighing, or weighing equipment" and that "contrary to Deputy Fitzgerald's trial testimony—a person's possession of a digital scale or scales, by itself, is not legally sufficient proof of possession of drug paraphernalia." While the Defendant acknowledges that digital or electronic scales have been held to be drug paraphernalia in other cases, he claims this was only when other circumstances existed. See id. at 846-47 & n.10 (concluding that the evidence was sufficient to sustain the defendant's conviction for possession of drug paraphernalia when (1) the defendant constructively possessed "electronic scales and plastic sandwich bags[,]" (2) an officer testified that electronic sales are "commonly used to weigh narcotics" in "bulk" sales of crack cocaine and that "plastic bags are commonly used to package crack cocaine, usually for resale[,]" (3) the scales and plastic bags were found "in close proximity to . . . a large amount of crack cocaine," and (4) "several 'rocks' of crack cocaine were already packaged for resale[.]"); see also State v. Christopher R. Rickman, No. W2008-02012-CCA-R3-CD, 2009 WL 3719458, at *4 (Tenn. Crim. App. Nov. 5, 2009) (holding that pipes with drug residue, baggies, and scales" were "drug paraphernalia" when "[t]he presence of residue on the pipes support[ed] the inference that they had been used in smoking the methamphetamine"); State v. Greg Harris, No. E2003-02834-CCA-R3-CD, 2005 WL 419082, at *8 (Tenn. Crim. App. Feb. 23, 2005) (holding that "the glass jars, microwave, scales, and baggies" were "drug paraphernalia intended for use in converting or processing, and packing or storing the cocaine" when these items were found with more than 300 grams of cocaine); accord State v. Tyson Reed King, No. M2017-01594-CCA-R3-CD, 2018 WL 4382074, at *3-4 (Tenn. Crim. App. Sept. 14, 2018) (concluding that "a single plastic sandwich bag" containing MDMA was "drug paraphernalia" when the

"baggie . . . was the item which the Defendant used to contain MDMA" and the existence of MDMA was established by a "drug field test").

The Defendant contends that none of these additional circumstances were present in his case. He asserts that (1) the digital scale was not tested for the presence of drug residue, (2) none of the State's witnesses testified that they observed a residue on the scale, (3) the Defendant did not make any statements to police about the scale's use or intended use, and (4) Deputy Fitzgerald acknowledged that scales like the one found in the Defendant's possession were "kitchen gadget[s]" that could be found in any household. The Defendant asserts that despite the lack of evidence of packed or repacked drugs, the prosecutor, during her questioning of Deputy Fitzgerald, emphasized that the digital scale found in the Defendant's vehicle should be considered "drug paraphernalia" because such scales are commonly used to "weigh[] and package[]" narcotics. He also asserts that this prosecutor told the jury during closing arguments that it could find that the digital scale was "drug paraphernalia" because (1) "drugs are often weighed and packaged according[] to their weight," (2) there was "the presence of marijuana in the vehicle," and (3) the jury instructions listed "packag[ing] and repackag[ing] drugs as one potential use for drug paraphernalia."

The Defendant insists that in his case, there was no evidence of any packaged or repackaged drugs and no indication that the digital scale was used or intended to be used for the weighing and packaging of drugs. He asserts that although Deputy Fitzgerald claimed the Defendant had enough marijuana in his ashtray for one "blunt" or "marijuana cigarette," he was never arrested or charged with possession of marijuana or any other drug. He also contends that the "substance" that Deputy Fitzgerald allegedly allowed him to dispose of "in the grass on the side of the road" was never recovered or tested by the Tennessee Bureau of Investigation and was never field tested by the officers at the scene. The Defendant argues that assuming that this substance was actually marijuana, it would have been an amount sufficient only for personal use. He then asserts the State's proof failed to establish that "digital scales are commonly used for personal amounts of marijuana" and showed only that the "scales are commonly used for weighing and packaging drugs to determine their felony or misdemeanor amount and cost, which is necessary only when the drugs are intended for resale." The Defendant states that he "was not found in possession of a large amount of marijuana, plastic bags, or cash, as might tend to indicate the weighing, packaging, repackaging, or selling of drugs." Accordingly, he maintains that "the mere presence of a digital scale—without any proof of the presence of illegal drugs or drug residue, without any proof of drug packaging or selling, and without any proof that the scale was being used for an illicit purpose—is not legally sufficient evidence to support a conviction for possession of drug paraphernalia."

First, as to the claim that the State failed to prove the digital scale was classifiable as drug paraphernalia, we note that drug paraphernalia is defined, in pertinent part, as "all equipment, products and materials of any kind which are used, intended for use, or designed for use in . . . preparing, . . . packaging, [or] repackaging . . . a controlled substance[.]" Tenn. Code Ann. § 39-17-402(12) (emphasis added). This court has routinely held that scales are classifiable as drug paraphernalia. See Ross, 49 S.W.3d at 846 (concluding that "[t]he evidence in the record demonstrates that the electronic scales and plastic sandwich bags could be used as drug paraphernalia"); State v. Gregory Gill, No. W2018-00331-CCA-R3-CD, 2019 WL 549651, at *12 (Tenn. Crim. App. Feb. 11, 2019) (concluding that three sets of scales and plastic baggies found in the defendant's rental car were drug paraphernalia in light of the officer's testimony that individuals often use plastic bags and digital scales to measure and package drugs for illegal sale and distribution and the fact that marijuana and cocaine were also found in the rental vehicle); State v. Jerry Floyd Caldwell, No. M1999-02363-CCA-R3-CD, 2001 WL 818207, at *5 (Tenn. Crim. App. July 20, 2001) (concluding that the scales, which were covered with a residue of white powder and were found with baggies, ties, a cut straw, and nine baggies of cocaine, were drug paraphernalia); see also Christopher R. Rickman, 2009 WL 3719458, at *4; Greg Harris, 2005 WL 419082, at *8.

The Defendant asserts that the digital scale is not drug paraphernalia because he "was not found in possession of a large amount of marijuana, plastic bags, or cash, as might tend to indicate the weighing, packaging, repackaging, or selling of drugs." While he claims that the State's proof failed to establish that "digital scales are commonly used for personal amounts of marijuana," we disagree.

Initially, we note that offense of possession of drug paraphernalia does not require that the object at issue be used in large-scale drug operations involving the packaging and repackaging of substantial amounts of drugs. In fact, the definition and examples of drug paraphernalia provided in Code section 39-17-402(12) reference certain items directly related to the personal use of drugs. Moreover, despite the Defendant's claims to the contrary, the State's proof did show that digital scales are commonly used for personal amounts of controlled substances. At trial, Deputy Fitzgerald testified, based on his education, training, and experience, that digital scales like the one found in the Defendant's vehicle are commonly used to weigh narcotics prior to packaging them, either to determine the cost of a drug or to determine whether the possession of a certain amount of a drug would be a misdemeanor or felony offense. Deputy Fitzgerald specifically noted that "[w]ith marijuana, anything over 14.5 grams is a felony." This proof is very consistent with the use of digital scales to weigh personal amounts of a controlled substance prior to packaging or repackaging it or in order to prepare a controlled substance prior to carrying or travelling with it. Furthermore, Deputy Fitzgerald testified that the Defendant was extremely nervous during the entirety of the traffic stop and that although the Defendant

- 13 -

repeatedly denied having drugs or firearms in his car, he finally admitted to possessing both marijuana and a handgun inside his vehicle. Deputy Fitzgerald's search revealed not only the digital scale in the Defendant's car but also marijuana wrapped in plastic in the Defendant's ashtray and a stolen, loaded Glock pistol, and both the marijuana and the pistol were depicted in the photograph he took at the scene that was admitted at trial. Given this evidence, a rational jury could have inferred that the Defendant used or intended to use the digital scale to prepare, package, or repackage a controlled substance, including the marijuana found in his car. Accordingly, we conclude that the record supports the jury's determination that the digital scale found in the Defendant's car is classifiable as drug paraphernalia pursuant to Code section 39-17-402(12).

Second, we address the Defendant's claim that the State failed to prove that he intended to use the digital scale for at least one of the illicit purposes enumerated in Code section 39-17-425(a)(1). The "illicit purposes" in the statute include the following, in pertinent part: "to . . . prepare, . . . pack [or] repack . . . a controlled substance[.]" Tenn. Code Ann. § 39-17-425(a)(1). Although the Defendant argues on appeal that the State failed to prove that he intended to use the scale for an illicit purpose, we have already summarized the substantial proof offered by the State on this issue. In addition to Deputy Fitzgerald's testimony, the jury was free to consider that the Defendant never provided any proof of an innocent explanation for the presence of the digital scale in his car and never presented any evidence that the substance depicted in the admitted photograph was not marijuana. As to Deputy Fitzgerald's testimony concerning the Defendant's admissions to possessing marijuana, "[i]t was the responsibility of the jury to determine whether [the Defendant's] statements were made, whether they were truthful, and what weight the statements should have been given in determining guilt or innocence." State v. Litton, 161 S.W.3d 447, 459 (Tenn. Crim. App. 2004); 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. § 42.11(a) (Prior Statement of the Defendant). While no proof was presented showing that the digital scale contained drug residue, there was no requirement that the scale actually contain drug residue in order for the State to prove the Defendant used or intended to use the scale to weigh a controlled substance, including marijuana. The jury, by its verdict, accredited Deputy Fitzgerald's testimony about the Defendant's admissions to the marijuana as well as Deputy Fitzgerald's testimony that digital scales are commonly used to weigh personal amounts of drugs. Given all of the evidence presented at trial, a rational jury could have found that the Defendant used or intended to use the digital scale to weigh a controlled substance prior to packing or repacking it or in order to prepare a controlled substance before carrying or travelling with it, either to determine the cost of a controlled substance during purchase or to avoid felony charges for possessing a controlled substance above a certain weight. See Tyson Reed King, 2018 WL 4382074, at *2 ("Drug offense charges are classified in part by weighing the amount of the drug in possession[.]"). In determining whether the evidence is sufficient to sustain this conviction, we decline the Defendant's entreaties for us to overturn the jury's factual findings on appeal. See Bland,

- 14 -

958 S.W.2d at 659. We also reject the Defendant's requests for us to reweigh the evidence or to substitute our inferences for those drawn by the jury. See Wagner, 382 S.W.3d at 297. Because a rational jury could have determined that the Defendant used or intended to use the digital scale for the illicit purpose of "prepar[ing], . . . pack[ing], [or] repack[ing] . . . a controlled substance," we conclude that the evidence, when viewed in the light most favorable to the State, is sufficient to sustain the Defendant's conviction for possession of drug paraphernalia.

**B. Theft of Property.** The Defendant also contends that the evidence is insufficient to sustain his conviction for theft of property. He claims that his possession of a handgun that is determined to be stolen, without any proof of how it was stolen or obtained, is not proof of theft of the handgun. The Defendant argues that "the time between the theft and [his] possession [of the gun]—almost six months to the day—is too attenuated for the gun to be deemed 'recently stolen goods.'" He also asserts that "the distance between the theft and [his] possession [of the gun]—nearly 50 miles, which is approximately an hour's drive—further separates [his] possession from the theft itself." The Defendant argues that there was no proof he knew the gun had been stolen, much less that he had been involved in the theft, and asserts that he was not found in possession of "a baseball bat, gloves, jumpsuit, or face mask," which were the items used by the two unidentified individuals who burglarized Tomlinson's gun store. He contends that "[w]hen all these circumstances are viewed together, no reasonable juror could have concluded, beyond a reasonable doubt, that [he] was guilty of theft merely because he possessed a previously stolen handgun."

In order to establish a violation of Code section 39-14-103, which defines the offense of theft of property, the State must prove the following three elements beyond a reasonable doubt: "(1) the defendant knowingly obtained or exercised control over property; (2) the defendant did not have the owner's effective consent; and (3) the defendant intended to deprive the owner of the property." Tenn. Code Ann. § 39-14-103; State v. Gentry, 538 S.W.3d 413, 422 (Tenn. 2017). Significantly, "'theft of property' [is] defined in terms of knowingly obtaining or exercising control over property without the owner's consent and with the intent to deprive the owner of the property." State v. James, 315 S.W.3d 440, 450 (Tenn. 2010) (citing Tenn. Code Ann. § 39-14-103) (emphasis added). Following the 1989 enactment of the current theft of property statute in Code section 39-14-103, larceny and other offenses were consolidated into a single "theft of property" offense, meaning that "[t]here is no difference between the actual larceny and either receiving or concealing the stolen property." Id.; Tenn. Code Ann. § 39-14-101 (stating that theft under the 1989 statute includes "the separate offenses referenced before 1989 as embezzlement, false pretense, fraudulent conversion, larceny, receiving or concealing stolen property, and other similar offenses." (emphasis added)); cf. Tenn. Code Ann. §§ 39-3-1101, -1112 (1982). Under the current consolidated theft statute, "'the critical inquiry is thus twofold: whether the actor had control of the property, no matter

- 15 -

how he got it, and whether the actor's acquisition or use of the property was authorized.'" Gentry, 538 S.W.3d at 423 (quoting Model Penal Code Commentaries at 166).

The unsatisfactorily explained possession of recently stolen property, in light of the surrounding facts and circumstances, creates a permissible inference[2] that the possessor stole the property or knew that it was stolen.[3] James, 315 S.W.3d at 450-52; see Bush v. State, 541 S.W.2d 391, 394 (Tenn. 1976); State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995); see also State v. Trenton Ray Forrester, No. W2018-01947-CCA-R3-CD, 2019 WL 4051801, at *3 (Tenn. Crim. App. Aug. 27, 2019). Such "[i]nferences from recently stolen property have a long history and widespread acceptance." James, 315 S.W.3d at 448 n.5. The jury may choose to apply this inference, even when presented with contradictory evidence or the defendant's contrary explanation. State v. Land, 681 S.W.2d 589, 591 (Tenn. Crim. App. 1984); see Bush, 541 S.W.2d at 395. Logically, a defendant's failure to provide any proof explaining his or her possession of the recently stolen property is also a circumstance from which the jury can draw the inference that the defendant stole the property or knew that it was stolen. State v. Veach, 456 S.W.2d 650, 652 (Tenn. 1970); Myers v. State, 470 S.W.2d 848, 318-19 (Tenn. Crim. App. 1971); State v. Andrew William Byers, No. 01C01-9601-CC-00002, 1997 WL 488621, at *5 (Tenn. Crim. App. Aug. 22, 1997); State v. Wallace Eugene Steadman, 1987 WL 5545, at *2 (Tenn. Crim. App. Jan. 23, 1987); see James, 315 S.W.3d at 453. The term "recently" is a relative concept that "depends upon the nature of the property and all of the facts and circumstances

---

[2] We note that "[g]enerally speaking, 'a permissive inference is not a violation of due process because the State still has the burden of persuading the jury that the suggested conclusion should be inferred based on the predicate facts proved.'" James, 315 S.W.3d at 450 (quoting Estelle v. McGuire, 502 U.S. 62, 78-79 (1991) (O'Connor, J., concurring & dissenting)).

[3] A different, more rigorous standard exists with regard that to the inference of burglary that arises from the possession of recently stolen property. As noted in James, "[T]he better rule is to permit the jury to infer a burglary from possession of recently stolen property only when there exists a rational connection between possession [of the stolen property] and participation [in the burglary], when guilt more likely than not flows from possession, and, importantly, when there is some other evidence corroborating the burglary that warrants the inference." James, 315 S.W.3d 440 (Tenn. 2010); see 2 Wharton's Criminal Law & Procedure § 411 (1st ed. 1957) ("While the possession of recently stolen goods gives rise to an inference that the possessor has stolen the goods, it is not ordinarily proof or prima facia evidence of burglary. There should be some evidence of guilty conduct besides the bare possession of the stolen property, before the inference of burglary be superadded to that of larceny."); 13 Am. Jur. 2d Burglary § 48 ("A defendant's possession of recently stolen property is sufficient to support a burglary conviction if there is a rational connection between his or her recent possession of property stolen in the burglary and his or her participation in the burglary; the defendant's guilt of burglary more likely than not flows from his or her recent, unexplained possession of the burglary proceeds, and there is evidence corroborating the defendant's guilt. . . . However, the mere possession of recently stolen goods does not constitute prima facie evidence of an unlawful entry by the possessor.").

shown by the evidence in the case." State v. Anderson, 738 S.W.2d 200, 202 (Tenn. Crim. App. 1987).

Although the Defendant acknowledges that a jury may infer theft from proof of possession of recently stolen property, he contends that "the mere act of possession is rarely sufficient, by itself, to invoke this inference. As support, the Defendant cites the following language from Bush v. State:

> The evidence of possession, sufficient to invoke the presumption, is seldom, if ever, alone. It necessarily establishes the time and distance relationship between the burglary or theft and the possession by defendant. Frequently the defendant's proximity to the place of taking and his opportunity or lack of opportunity to have committed the theft are revealed by some circumstance accompanying the proof of possession. In short, the evidence of possession is almost inevitably accompanied by facts that either increase or decrease the degree of probability. Thus the evidence of possession sufficient to invoke the presumption will vary widely from case to case; and at one end of the spectrum, the degree of probability that defendant committed the theft will be so strong that a clear and cogent explanation may be necessary to convince a jury that the presumption has been overcome, while at the other end of the spectrum, a reasonable explanation of much less probative value will suffice.

541 S.W.2d at 396.

In this case, during a hearing outside the presence of the jury and after the defense's motion for judgment of acquittal, the trial court informed the parties that it was planning to provide a jury instruction regarding the inference of theft from the possession of recently stolen property. The court provided both parties with the specific language of the jury instruction, and the Defendant's attorney stated that he had "[n]o objection" to this instruction. Later, after instructing the jury on the theft of property offense, the trial court provided the following instruction to the jury regarding the inference of theft that arises from a defendant's possession of recently stolen property, which closely mirrors the pattern instruction:

> Now, ladies and gentlemen, if you find beyond a reasonable doubt from the evidence in this case that the property in question had been recently stolen and that soon thereafter this same property was discovered in the exclusive possession of the Defendant, this possession, unless satisfactorily explained, is ordinarily a circumstance from which you may reasonably draw an inference that the Defendant gained possession through theft. However,

- 17 -

you are never required to make this inference, or these inferences. It is for you to determine whether the facts and circumstances shown by the evidence in the case warrant any inference which the law permits you to draw from the possession of recently stolen property. When the evidence is offered that the Defendant was in possession of recently stolen property, the Defendant has the right to introduce evidence that he came into possession of the property lawfully or possession may be satisfactorily explained through other circumstances or other evidence independently of any testimony or evidence offered by the Defendant. In considering whether possession of recently stolen property has been satisfactorily explained, you are reminded that in the exercise of constitutional rights, the accused need not take the witness stand and testify.

The term ["]recently["] is a relative term and has no fixed meaning. Whether a property may be considered as recently stolen depends upon the nature of the property and all the facts and circumstances shown by the evidence in this case. The longer the period of time since the theft, the more doubtful becomes the inference which may be drawn for unexplained possession.

The correctness of the inference and the weight to be given any explanation that may be shown by the evidence are matters that must be determined by you, and you are not bound to accept them. You must weigh all the evidence presented as to the Defendant's alleged possession of the property in question and decide in light of all the facts and circumstances in the case whether any inference is warranted. You are reminded that the burden of proving the Defendant's guilt of the offense beyond a reasonable doubt remains upon the State of Tennessee.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.20 (Inference from possession of recently stolen property).

The Defendant asserts that he was not arrested "until six months after the break-in at the gun store, when he was stopped for an unrelated traffic violation nearly 50 miles away in Bolivar, Tennessee." He argues that the differences in time and place between the burglary of the gun store and his possession of the stolen Glock, as well as the "highly transferable" nature of the handgun, make the evidence insufficient to sustain his theft conviction. Interestingly, the record shows not only that the Defendant had "no objection" to the trial court's instruction on the inference but also that the Defendant never filed a motion for new trial challenging this inference instruction. Consequently, the Defendant has waived any challenge to the inference instruction itself. See Tenn. R. Crim. P. 30(b);

- 18 -

State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005). In any case, we recognize that the trial court properly instructed the jury that it was not required to make this inference, that the Defendant had a right not to testify at trial, and that the State had the burden of proving the Defendant's guilt beyond a reasonable doubt. See James, 315 S.W.3d at 454. The jury, after being properly instructed and fully informed of the differences in time and location between the burglary and the Defendant's possession of the stolen handgun, ultimately found the Defendant guilty beyond a reasonable doubt of theft of property. Cf. State v. Jerry Sherrill, II, No. W2013-01166-CCA-R3-CD, 2014 WL 2547775, at *11-12 (Tenn. Crim. App. May 30. 2014) (concluding that there was no error in the trial court's inference instruction where the defendant was found in possession of a stolen Camaro nearly seven months after it had been stolen). We decline the Defendant's request for us to re-weigh the evidence or to substitute our inferences for those drawn by the jury. Wagner, 382 S.W.3d at 297. As we will explain, the evidence is sufficient to sustain the Defendant's theft conviction.

The Defendant also claims that the evidence is "legally insufficient to establish any degree or probability that [the Defendant] committed the theft." He contends that while the State's proof showed that ten guns had been stolen from "J & H Guns" in Corinth, Mississippi by two unidentified individuals, neither the Defendant nor his female passenger were ever alleged to be responsible for this crime. He adds that only one of the ten pistols stolen was found in his possession and that he was never found in possession of "a baseball bat, gloves, jumpsuit, or face mask," which were the items used by the two unidentified individuals who burglarized the gun store. However, as the previous explanation of the current consolidated theft statute makes clear, a defendant does not have to steal the property from the victim in order to be convicted of theft of property. As we will more fully develop below, the evidence is sufficient to show that the Defendant, at a minimum, exercised control over the Glock handgun with intent to deprive the owner of the property and without the owner's effective consent. See Tenn. Code Ann. § 39-14-103; Gentry, 538 S.W.3d at 423 (Under the current consolidated theft statute, "the critical inquiry is thus twofold: whether the actor had control of the property, no matter how he got it, and whether the actor's acquisition or use of the property was authorized." citation and quotation marks omitted)).

The evidence, when viewed in the light most favorable to the State, showed that a nine millimeter Glock 19 semi-automatic pistol, along with nine other guns, was stolen from John Whitney Hughes Tomlinson's gun store during a burglary on August 30, 2018. Tomlinson stated that he never gave anyone consent to take, to keep, to possess, or to exercise control over the Glock pistol. The Defendant was in possession of the stolen Glock when he was arrested the night of February 23, 2019, less than six months after the burglary of Tomlinson's gun store. Deputy Wooley testified at trial that he saw the Defendant "trying to push something between the driver's seat and center console of the

car" when Deputy Fitzgerald returned to his cruiser to check the Defendant and his passenger for outstanding warrants. Deputy Fitzgerald testified that the Defendant was extremely nervous during the entirety of the traffic stop, even after he was informed that he would not receive a ticket, and that the Defendant lied to him at least twice about having a firearm before finally acknowledging that he had a gun in his vehicle. During the search of the Defendant's vehicle, Deputy Fitzgerald observed the butt of handgun magazine "in between the driver's seat and the center console[,]" and noted that it had been "shoved down pretty far[.]" In an attempt to determine why the gun had been pushed so far down between the seats and why the Defendant was so nervous, Deputy Fitzgerald asked the Defendant if the handgun was stolen, and the Defendant replied, "It's not hot. It's not hot." Deputy Fitzgerald later determined that the gun in the Defendant's vehicle was the Glock 19 that had been stolen from Tomlinson's gun store.

The aforementioned evidence raised the logical inference to the jury that the Defendant was guilty of the theft offense because he either stole the Glock pistol or knew it was stolen and intended to deprive the owner of it. James, 315 S.W.3d at 453; Christopher R. Rickman, 2009 WL 3719458, at *3. Because the Defendant provided no proof explaining his possession of the stolen gun at trial, the State's evidence went unrefuted, and the inference of the Defendant's guilty knowledge was not negated. We conclude that evidence of the Defendant's possession of the stolen gun, when considered along with his attempt to hide the gun from law enforcement, his dishonesty about having a gun in his car, his extreme nervousness even after being informed that he would not receive a ticket, his overzealous insistence that the gun was "not hot," and his failure to provide any proof explaining his possession of the stolen handgun is sufficient to sustain the Defendant's conviction for theft of property.

**II. Imposition of Fines.** The Defendant argues that his fines in Counts 2 and 3 should be vacated because the trial court failed to conduct an independent assessment of the fines fixed by the jury, including the Defendant's ability to pay them. He claims "the trial court may not have even understood that it had both the authority and the discretion to reduce or waive the fines, because the court stated that [the Defendant] 'asked for a jury trial, and that included fine assessment." He also maintains that the court, after acknowledging that the Defendant "was going to owe a lot of money," chose not to reduce or waive the fines and merely "rubber-stamped the fines set by the jury." The Defendant contends that because the trial court failed to exercise its own discretion on the fines, this court should reverse and remand the fine determination for reconsideration, "with instructions for the trial court to independently assess the jury-imposed fines and determine whether they should be reduced or waived in light of [the Defendant's] lack of criminal history, his status as an indigent defendant, the lack of applicable enhancement factors, the fact that the owner of the handgun had already been compensated for his loss through insurance, and the fact that [the Defendant's] convictions were all for misdemeanor

offenses." In response, the State contends that the trial court properly imposed the fines fixed by the jury. We agree with the State.

This court reviews a trial court's imposition of a fine, which is part of a defendant's sentence, under an abuse of discretion standard. State v. Bryant, 805 S.W.2d 762, 767 (Tenn. 1991); State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). Typically, fines are fixed by a jury unless the defendant waives this constitutional protection. Tenn. Const. art. VI, § 14; Tenn. Code Ann. § 40-35-301(b); State v. Mahoney, 874 S.W.2d 627, 630 (Tenn. Crim. App. 1993). Here, the record makes it clear that the Defendant chose to have the jury fix the fines in his case.

A trial court has "the power to impose any fine which does not exceed the fine fixed by the jury, and to reduce, suspend, or release fines." Bryant, 805 S.W.2d at 765 (citing Tenn. Code Ann. §§ 40-24-101, -102, -104); see Tenn. Code Ann. § 40-35-301(b). In imposing a fine, the trial court must consider the principles of sentencing, including "prior offenses, potential for rehabilitation, mitigating and aggravating circumstances, and other matters relevant to an appropriate sentence." Bryant, 805 S.W.2d at 765-66.

It is well recognized that a defendant's ability to pay is a factor in the establishment of a fine. State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. 1996). "[A]lthough the defendant's ability to pay a fine is a factor, it is not necessarily a controlling one." State v. Marshall, 870 S.W.2d 532, 542 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999). While "an oppressive fine can disrupt future rehabilitation and prevent a defendant from becoming a productive member of society[,] . . . a significant fine is not automatically precluded just because it works a substantial hardship on a defendant—it may be punitive in the same fashion incarceration may be punitive." Id. Moreover, while the record shows that the Defendant was indigent, we recognize that "[a] declaration of indigency, standing alone, does not, however, immunize the defendant from fines" and is "merely one factor which may be taken into account." Alvarado, 961 S.W.2d at 153.

The record shows that the trial court instructed the jury that if it found the Defendant guilty beyond a reasonable doubt of failure to maintain lane in Count 1, then the jury, in its discretion, could fix a fine in an amount of not more than $50.00, but not less than zero dollars. See Tenn. Code Ann. § 40-35-111(e)(3). The court also informed the jury that if it found the Defendant guilty beyond a reasonable doubt of possession of drug paraphernalia in Count 2, then the jury, in its discretion, could fix a fine of not more than $2500.00, but not less than $150.00. See id. §§ 40-35-111(e)(1), 39-17-428(b)(7). Finally, the trial court informed the jury that if it found the Defendant guilty beyond a reasonable doubt of theft of property in Count 3, then the jury, in its discretion, could fix a fine of not more than $2500.00, but not less than zero dollars. See id. § 40-35-111(e)(1). Ultimately,

the jury fixed a fine of $0.00 in Count 1, a fine of $150.00 in Count 2, and a fine of $500.00 in Count 3.

We note that during the entirety of the sentencing hearing, the Defendant never raised an objection regarding his fines, never presented any proof regarding his ability to pay fines, and never argued that the trial court should refrain from imposing the fines fixed by the jury for any reason. Rather, the Defendant only argued for a suspended sentence and no jail time. By failing to do so the Defendant risked waiver of this issue. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Alvarado, 961 S.W.2d at 153 ("Ordinarily, issues raised for the first time on appeal are waived."); State v. Maddin, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005) ("When an issue is raised for the first time on appeal, it is typically waived."); State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995) ("A party may not raise an issue for the first time in the appellate court."); State v. Charles A. Kennedy, No. M2013-02207-CCA-R9-CD, 2014 WL 4953586, at *10 (Tenn. Crim. App. Oct. 3, 2014) ("Because the State failed to present this argument in the trial court, the trial court did not have the opportunity to pass on it, and we will not consider it."). In any event, we will briefly address the merits of the Defendant's claims.

As to the Defendant's fine in Count 2 for possession of drug paraphernalia, the Tennessee General Assembly has determined that a mandatory minimum fine of $150.00 is required for that particular offense. See Tenn. Code Ann. § 39-17-428(b)(7). Accordingly, we conclude that the trial court did not abuse its discretion in imposing the $150.00 fine fixed by the jury in Count 2.

Next, as to the Defendant's fine in Count 3 for theft of property, the trial court recognized that the Defendant "had no prior criminal history[,]" that he had only been convicted of "misdemeanor offenses[,]" and that "there were really no aggravating circumstances at the time of the stop and the arrest." The trial court asked the Defendant if he had a job, and the Defendant replied that he had a job interview "Monday in Murfreesboro, Tennessee." The court then asked if the Defendant would have a place to live if he were offered the job in Murfreesboro, the Defendant replied that he did have a place to live, although he currently lived at home with his mother in Bolivar, Tennessee. In response to the court's questioning, the Defendant acknowledged that he had been employed at two other jobs for short periods of time. The trial court then stated, "The fines will stand. He asked for a jury trial, and that included fine assessment, so we do have the fines of $500 on the theft and $150 on the [possession of drug] paraphernalia[.]" Although the trial court recognized that the Defendant was "going to owe a lot of money" and was currently unemployed, it chose to impose the fines set by the jury and informed the Defendant that the minimum payment on these fines was $100.00 a month.

The record shows that the trial court conducted a full, independent assessment of the fines fixed by the jury, specifically considering the Defendant's ability to pay these fines. The court determined that the Defendant had been employed in the past and was searching for work while living with his mother. At the conclusion of the sentencing hearing, the trial court ordered the Defendant to serve only ten days in jail, with the remainder of his of his eleven months and twenty-nine day sentence supervised by community corrections. In light of these facts, we likewise conclude that the trial court did not abuse its discretion in imposing the $500.00 fine in Count 3. Accordingly, the Defendant is not entitled to relief.

## CONCLUSION

Because the evidence is sufficient to sustain the Defendant's convictions in Counts 2 and 3 and the trial court did not abuse its discretion in imposing the fines fixed by the jury in those counts, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE